IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| **DIGITAL GENERATION, INC. f/k/a,** | § | |
| **DG FASTCHANNEL, INC.,** | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. **3:12-CV-00329-L** |
| | § | |
| **STEVEN A. BORING,** | § | |
| | § | |
| Defendant. | § | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Before the court is Plaintiff's Motion for Preliminary Injunction in Aid of Arbitration (Doc.

5), filed February 1, 2012; Defendant's Motion to Dismiss Plaintiff's Verified Complaint or in the

Alternative to Stay the Proceedings (Doc. 13), filed February 24, 2012; Defendant's Motion to Strike

Plaintiff's Reply Brief in Support of Motion for Preliminary Injunction (Doc. 25), filed March 30,

2012; and Plaintiff's Motion for Leave to file Recast Reply Brief (Doc. 28), filed April 3, 2012.

After considering the motions, record, and applicable law, the court **denies** Defendant's Motion to

Dismiss Plaintiff's Verified Complaint and **denies as moot** its Alternative [Request] to Stay the

Proceedings (Doc. 13); **denies** Plaintiff's Motion for Preliminary Injunction in Aid of Arbitration

(Doc. 5); **grants** Plaintiff's Motion for Leave to file Recast Reply Brief (Doc. 28); **denies as moot**

Defendant's Motion to Strike Plaintiff's Reply Brief in Support of Motion for Preliminary Injunction

(Doc. 25); and **dismisses** this action **with prejudice**.

## I.      Background

Plaintiff Digital Generation, Inc. f/k/a DG FastChannel, Inc. ("DG") commenced this action on January 31, 2012, against former employee Steven A. Boring ("Boring"), seeking only injunctive relief in the form of an *ex parte* temporary restraining order ("TRO") and preliminary injunction. DG also initiated a related arbitration against Boring in Dallas, Texas.  The exact status of the arbitration is unclear but according to the parties' briefing, they "are currently working within the arbitration forum as mandated by their arbitration agreement."  Def.'s Resp. 4.  The arbitration and this action both stem from DG's belief that Boring has or will breach an employment agreement that precludes him from: (1) soliciting, for a period of twelve months after leaving DG, DG's customers or prospective customers with whom he had contact regarding DG's business during the previous two years; (2) disclosing confidential information defined as "any trade secret, confidential, proprietary, or non-public information and materials concerning [DG] or its clients"; and (3) recruiting other DG employees for a period of one year after leaving the company.  Pl.'s Compl., Ex. A, ¶¶  2, 4, and 5.

DG provides advertising and related services.  Boring joined DG in 2004 as a regional sales manager for DG's Detroit office after his former employer was acquired by DG.  According to DG, Boring oversaw or participated in a majority of DG's advertising sales to its clients in the Detroit area and was responsible for advertising that DG provided to two of its biggest clients, General Motors ("GM") and Chrysler Group ("Chrysler").  DG contends that Boring was also privy to certain information that DG considers confidential, including marketing strategies, client lists, and DG employee contact information.  Boring signed the employment agreement at issue that forms the basis for DG's Complaint and request for injunctive relief on March 7, 2011.

Later that same year on December 16, 2011, Boring received an offer of employment from Extreme Reach, another advertising agency in the Detroit area that DG contends is in direct competition with it.  Boring accepted the offer of employment and notified DG on December 19, 2011, of his resignation and decision to work for Extreme Reach. Before leaving DG, Boring requested that he be able to access a folder on his DG laptop that contained personal information. DG discovered that the folder accessed by Boring contained personal information, as well as information that DG considers confidential, including: an internal DG presentation regarding high definition advertising; holiday client mailing lists for 2010 and 2011; a DG employee contact sheet containing employee cell phone numbers; a pricing document; a GM high definition rate reduction agency letter; and a sales report regarding November pricing for the Detroit area.  It is not clear from DG's motion or pleadings whether this discovery was before or after Boring left the company.  It is also unclear whether Boring took copies of these materials with him when he left the company.

Boring started working for Extreme Reach on January 3, 2012, as its regional director of sales.  On January 19, 2012, Extreme Reach issued a press release stating that it intended to open a Detroit office to expand its presence to the Detroit automobile industry hub.  On January 25, 2012, DG received information from an unspecified source that Boring and Chris Palmer ("Palmer"), another former DG employee, had visited Goodby Silverstein & Partners ("Goodby").  According to DG's complaint, Goodby provides a large volume of advertising for GM.  DG therefore contends that "it appears that Mr. Boring is directly soliciting GM to move its advertising business from DG to Extreme Reach, in violation of the non-solicitation provision of the Employment Agreement." Pl.'s Compl. 8, ¶ 23.  In addition, DG contended that "[i]f Mr. Boring is permitted to recruit personnel from DG to Extreme Reach, DG's Detroit office will wither, the relationships it has

developed with advertisers will diminish, if not terminate altogether, and DG will be irreparably harmed." Pl.'s Compl. 12, ¶ 40.

In its February 2, 2012 memorandum opinion and order, the court denied without prejudice DG's request for an *ex parte* TRO that would have restrained Boring, for a period of fourteen days, from violating the employment agreement. The court, however, delayed ruling on Plaintiff's Motion for Preliminary Injunction in Aid of Arbitration until after service had been effected on Defendant Boring and he had an opportunity to file an answer in the action and a response to Plaintiff's motion. Since the court's ruling denying its request for an *ex parte* TRO, DG submitted additional evidence, first on March 23, 2012, in conjunction with its reply brief, and again on April 3, 2012, in an effort to correct the deficiencies noted in the court's prior order and Boring's response, and to establish that Boring has solicited DG clients, disclosed confidential information, and recruited DG employees in violation of his employment agreement. As explained herein, however, the new evidence was not submitted until sometime after Boring had already responded to DG's motion for a preliminary injunction.

On February 24, 2012, Boring moved to dismiss this action for lack of personal jurisdiction. Alternatively, Boring requested that the court stay the case pending arbitration if it is determined that the court has personal jurisdiction. On March 9, 2012, Boring responded and objected to Plaintiff's Motion for Preliminary Injunction in Aid of Arbitration, arguing that the court lacks personal jurisdiction over him, and DG has not met its burden for a preliminary injunction. On March 3, 2012, Boring also moved to strike the reply filed by DG in support of its request for injunctive relief on the grounds that it exceeded the page limit for replies in violation of the court's local rules. On April 3, 2012, DG responded to Boring's motion for strike and sought leave to file a "recast" or

amended reply that conformed with the local rule requirement regarding page limits.  On the same day, DG submitted additional declaration testimony to support its contention that Boring recruited a DG employee in violation of his employment agreement.  The supplemental materials were filed without leave of court and without conferring with Boring.  Before considering the parties' argument regarding the injunctive relief requested by DG, the court first determines whether it has personal jurisdiction over Boring.

## II.    Personal Jurisdiction

### A.    Standard for Motion to Dismiss for Lack of Personal Jurisdiction

On a motion to dismiss for lack of personal jurisdiction, the plaintiff bears the burden of establishing a prima facie case for the court's jurisdiction over a nonresident defendant.  *See Ham v. La Cienega Music Co.*, 4 F.3d 413, 415 (5th Cir. 1993); *Stuart v. Spademan*, 772 F.2d 1185, 1192 (5th Cir. 1985).  When the court rules on the motion without an evidentiary hearing, the plaintiff may establish personal jurisdiction by presenting a prima facie case that personal jurisdiction is proper, *id.*; proof by a preponderance of the evidence is not required.  *International Truck and Engine Corp. v. Quintana*, 259 F. Supp. 2d 553, 556 (N.D. Tex. 2003) (citing *WNS, Inc. v. Farrow*, 884 F.2d 200, 203 (5th Cir. 1989)).  The court may determine the jurisdictional issue by receiving affidavits, interrogatories, depositions, oral testimony, or any combination of the recognized methods of discovery.  *Stuart*, 772 F.2d at 1192.  Uncontroverted allegations in a plaintiff's complaint must be taken as true, and conflicts between the facts contained in the parties' affidavits must be resolved in favor of the plaintiff.  *Bullion v. Gillespie*, 895 F.2d 213, 217 (5th Cir. 1990).  After a plaintiff makes his prima facie case, the burden then shifts to the defendant to present "a compelling case that the

presence of some other consideration would render jurisdiction unreasonable." *Burger King Corp.*

*v. Rudzewicz*, 471 U.S. 462, 477 (1985).

A federal court has jurisdiction over a nonresident defendant if the state long-arm statute confers personal jurisdiction over that defendant, and if the exercise of jurisdiction is consistent with due process under the United States Constitution. *Ruston Gas Turbines, Inc. v. Donaldson Co., Inc.,* 9 F.3d 415, 418 (5th Cir. 1993). Because the Texas long-arm statute extends to the limits of federal due process, *Schlobohm v. Schapiro*, 784 S.W.2d 355, 357 (Tex. 1990), the court must determine whether (1) the defendants have established "minimum contacts" with the forum state; and, (2) whether the exercise of personal jurisdiction over the defendants would offend "traditional notions of fair play and substantial justice." *Ruston Gas*, 9 F.3d at 418 (*citing International Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)).

The "minimum contacts" prong is satisfied when a defendant "purposefully avails itself of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws." *Burger King*, 471 U.S. at 475. The nonresident defendant's availment must be such that the defendant "should reasonably anticipate being haled into court" in the forum state. *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980). This test "ensures that a defendant will not be haled into a jurisdiction solely as a result of 'random,' 'fortuitous,' or 'attenuated' contacts, or of the 'unilateral activity of another party or a third person.'" *Burger King*, 471 U.S. at 475 (citations omitted). The "minimum contacts" prong of the inquiry may be subdivided into contacts that give rise to "specific" personal jurisdiction and those that give rise to "general" personal jurisdiction. *Marathon Oil Co. v. A.G. Ruhrgas*, 182 F.3d 291, 295 (5th Cir. 1999). Specific jurisdiction is only appropriate when the nonresident defendant's contacts with the

forum state arise from, or are directly related to, the cause of action.  *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 n.8 (1984).  The exercise of general personal jurisdiction is proper when the nonresident defendant's contacts with the forum state, even if unrelated to the cause of action, are continuous, systematic, and substantial.  *Id.* at 414 n.9.

In evaluating the second prong of the due process test, the court must examine a number of factors in order to determine fairness and reasonableness, including: (1) the defendant's burden; (2) the forum state's interests; (3) the plaintiff's interest in convenient and effective relief; (4) the judicial system's interest in efficient resolution of controversies; and (5) the state's shared interest in furthering social policies.  *Asahi Metals Indus. Co. v. Superior Court*, 480 U.S. 102, 112 (1987).  As noted above, "once minimum contacts are established, a defendant must present 'a compelling case that the presence of some consideration would render jurisdiction unreasonable.'"  *Eviro Petroleum, Inc. v. Kondur Petroleum*, 79 F. Supp. 2d 720, 725 (S.D. Tex. 1999) (*quoting Burger King*, 471 U.S. at 277).  In fact, "[o]nly in rare cases . . . will the exercise of jurisdiction not comport with fair play and substantial justice when the nonresident defendant has purposefully established minimum contacts with the forum state."  *Id.*  (*quoting Guardian Royal Exch. Assurance, Ltd. v. English China Clays, P.L.C.*, 815 S.W.2d 223, 231 (Tex. 1991)).

B.      **Analysis**

Boring contends that the court does not have specific or general personal jurisdiction over him because he has no connections with Texas and all alleged wrongdoing occurred in Michigan. DG counters, and the court agrees, that Boring impliedly consented to the court's jurisdiction by agreeing to arbitrate in Dallas, Texas.  *See Painewebber Inc. v. The Chase Manhattan Private Bank (Switzerland)*, 260 F.3d 453, 461 (5th Cir. 2001).  Boring disagrees with DG's interpretation of the

arbitration provision contained in his employment agreement and contends that DG's interpretation makes the agreement to arbitrate illusory.  At the same time, however, he argues that the parties' dispute should be arbitrated in accordance with the arbitration agreement.

Other than Boring's conclusory assertion that DG's interpretation of the arbitration agreement makes it illusory, neither party presented arguments or legal authority regarding the validity or enforceablility of the arbitration agreement.  The court concludes that enforcing the arbitration agreement, as written, does not make it illusory, because the right to seek injunctive relief in court and the right to arbitrate are not necessarily incompatible.  *See Lawrence v. Comprehensive Bus. Servs. Co.*, 833 F.2d 1159, 1163 (5th Cir. 1987).  In addition, the court construes Boring's contention that DG's claims, including its claim for injunctive relief, should be arbitrated as his acknowledgment that the arbitration agreement is valid and enforceable.  The court therefore determines that Boring impliedly consented to the court's jurisdiction by agreeing to arbitrate in Dallas, Texas, and **denies** Defendant's Motion to Dismiss Plaintiff's Verified Complaint.  DG's alternative request to stay the case pending arbitration are discussed herein separately.

III.     **Boring's Motion to Strike DG's Reply for Exceeding Page Limit and DG's Request for Leave to File Amended Reply**

DG's original and "recast" replies address DG's request for injunctive relief and the issue of whether the court has authority to consider the request before a ruling by the arbitrator.  The court therefore considers Boring's motion to strike DG's reply and DG's request for leave to file its proposed amended reply before addressing the parties' arguments regarding court's authority, DG's request for injunctive relief, and the parties' contentions as to whether the case should be stayed pending arbitration.

Boring moved to strike the reply filed by DG in support of its motion for a preliminary injunction on the grounds that it violated Local Rule 7.2's requirement that reply briefs be limited to 10 pages, and DG failed to seek leave to exceed the page limit.  The reply filed by DG was 13 pages in length.  DG responded to the motion to strike by apologizing for the oversight and moved for leave to file an amended or "recast" reply.  Attached to DG's motion for leave is a copy of its proposed "recast" motion that is 10 pages in length. The exhibits to the amended reply are the same as those filed in conjunction with DG's original reply on March 23, 2012. Boring opposes DG's motion for leave.

The court has compared the original and amended reply.  The proposed amended reply is substantially similar in substance to the original reply and does not include new arguments or legal authority, and is based on the same evidence previously submitted in conjunction with its original reply.  Accordingly, rather than striking the last three pages of DG's original reply brief, the court will permit DG to file its amended reply and deny as moot Boring's motion to strike.  As previously noted, however, DG's original and amended reply contain new arguments based on new evidence that Boring did not have an opportunity to address, and DG did not seek leave to submit the new evidence or offer an explanation for the untimely submission.  Rather than further delaying the resolution of DG's motion for preliminary injunction by permitting additional briefing, the court exercises its discretion to not consider the new arguments and evidence to avoid prejudice to Boring. *See Springs Indus., Inc. v. American Motorists Ins. Co.*, 137 F.R.D. 238, 239-40 (N.D. Tex. 1991) ("[W]here a movant has injected new evidentiary materials in a reply without affording the nonmovant an opportunity for further response, the court still retains the discretion to decline to consider them.").

**Memorandum Opinion and Order - Page 9**

IV.    **Preliminary Injunction Requested by DG**

   A.    **Standard for Preliminary Injunction**

   There are four prerequisites for the extraordinary relief of a preliminary injunction.  A court

may grant a preliminary injunction only when the movant establishes that:

> (1) there is a substantial likelihood that the movant will prevail on the merits; (2) there is a substantial threat that irreparable harm will result if the injunction is not granted; (3) the threatened injury [to the movant] outweighs the threatened harm to the defendant; and (4) the granting of the preliminary injunction will not disserve the public interest.

*Clark v. Prichard*, 812 F.2d 991, 993 (5th Cir. 1987) (citing *Canal Auth. of the State of Florida  v.*

*Callaway*, 489 F.2d 567, 572 (5th Cir. 1974) (*en banc*)).  The party seeking such relief must satisfy

a cumulative burden of proving each of the four elements enumerated before a preliminary injunction

can be granted.  *Mississippi Power & Light Co. v. United Gas Pipeline*, 760 F.2d 618, 621 (5th Cir.

1985); *Clark*, 812 F.2d at 993.  Otherwise stated, if a party fails to meet *any* of the four requirements,

the court cannot grant the preliminary injunction.

   Because a preliminary injunction is considered an "extraordinary and drastic remedy," it is

not granted routinely, "but only when the movant, by a clear showing, carries the burden of

persuasion."  *Holland Am. Ins. Co. v. Succession of Roy*, 777 F.2d 992, 997 (5th Cir. 1985). The

decision to grant or deny preliminary injunctive relief is left to the sound discretion of the district

court. *Mississippi Power & Light Co.*, 760 F.2d at 621.  Even when a movant establishes each of

the four *Canal* requirements, the decision whether to grant or deny a preliminary injunction remains

discretionary with the court, and the decision to grant a preliminary injunction is treated as the

exception rather than the rule.  *Mississippi Power & Light*, 760 F.2d at 621.

**Memorandum Opinion and Order - Page 10**

B.      Analysis

DG's request for injunctive relief is predicated on three alleged violations of the employment agreement: (1) Boring's alleged solicitation of DG's clients in violation of paragraph 4 of the employment agreement; (2) Boring's alleged disclosure of DG's confidential information in violation of paragraph 2 of the employment agreement; and (3) Boring's alleged recruitment of DG employees in violation of paragraph 5 of the employment agreement. Boring in response contends that DG's request for injunctive relief from the court is premature, because the parties' arbitration agreement requires that the arbitrator first decide whether there has been a violation of the employment agreement before a court can determine if an injunction is appropriate to "to prevent any continuation of any violation" of the agreement. Def.'s App. 8, ¶ 14; Def.'s Resp. 2-6. Boring further responds that even if the relief requested is not premature, DG has not met its burden of making the required showing necessary for a preliminary injunction. Before addressing DG's grounds for injunctive relief, the court considers first the parties' arguments as to whether it has authority under the arbitration agreement to decide DG's request for injunctive.

1.      Whether DG's Request for Injunctive Relief by the Court is Premature

As noted above, the parties disagree whether their arbitration agreement permits the court, at this stage, to consider DG's request for injunctive relief, before the arbitrator has determined whether Boring violated the employment agreement. The arbitration agreement is set forth in paragraph 14 of the employment agreement and states in pertinent part:

> Employee [Boring] agrees that any dispute or controversy arising out of, relating to, or concerning any interpretation, construction, performance or breach of this Agreement or Employee's employment with the Corporation [DG] . . . shall be exclusively settled by final and binding arbitration . . . *except that the Corporation [DG] shall be entitled to seek injunctive relief in any court of competent jurisdiction*

> *to prevent any continuation of any violation of the provisions of Sections 2, 4, 5, and 7 of this Agreement*.  The Arbitrator still may grant injunctions or other relief in such dispute or controversy.  The decision of the arbitrator shall be final, conclusive and binding on the parties to the arbitration.

Def.'s App. 8, ¶ 14 (emphasis added).  Based on the express language in this paragraph, and in particular the inclusion in this paragraph of the term "to prevent any continuation of any violation," Boring contends that judicial intervention is only permissible after a violation of the employment agreement has been found by the arbitrator.  Boring additionally asserts that because the arbitration is already underway, the proper forum for DG's motion for injunctive relief is the arbitration, and the court should not intervene.  For support that intervention by the court during the pendency of the arbitration would be inappropriate, Boring cites *RGI, Incorporated v. Tucker & Associates, Incorporated*, 858 F.2d 227, 229-30 (5th Cir. 1988).  Both parties acknowledge that the court in *RGI* upheld a judicial injunction to maintain the status quo pending arbitration based on the language in the parties' arbitration agreement that permitted such relief. They disagree, however, whether the language in their arbitration agreement permits the court to grant injunctive relief during the pendency of the arbitration.

The court in *RGI* noted the circuit split concerning a district court's power under the Federal Arbitration Act ("FAA") to issue an injunction while arbitration is pending but declined to weigh in on the issue, as the "bargained-for arbitration provision [at issue] clearly contemplate[d] that the status quo is to continue during arbitration." *Id*. at 231.  The court therefore concluded that "it was appropriate for the district court to issue the preliminary injunction to insure that the arbitration clause of the contract will be carried out as written."  *Id*.  Unlike the arbitration agreement at issue

in *RGI*,[1] the language in the parties' agreement expressly states that DG may seek injunctive relief from a court of competent jurisdiction or the arbitrator.   Moreover, the court rejects Boring's argument that an arbitrator must first make a finding on the merits of whether he violated the employment agreement before DG can seek injunctive relief from a court, because such an interpretation would defeat the purpose of permitting DG to seek injunctive relief.  A finding on the merits could take months or years and would defeat entirely the purpose of allowing injunctive relief to maintain the status quo, regardless of whether it was granted by a court or arbitrator.  Additionally, requiring a conclusive finding on the merits is contrary to the requirement that a party need only demonstrate a substantial likelihood of prevailing on the merits to be entitled to injunctive relief.

Furthermore, similar arguments that an arbitration agreement is rendered illusory by the inclusion of language permitting injunctive relief by a court have been rejected by the Fifth Circuit. *See Lawrence*, 833 F.2d at 1163.  Because the arbitration provision limits a court's granting of an injunction "*to prevent any continuation of any violation of the provisions of Sections 2, 4, 5, and 7 of this Agreement,*" and is limited to injunctive relief, the court determines that it is not illusory as written.  *See id.*  The court notes, however, that neither party has cited to any cases in which injunctive relief was sought *after* arbitration was commenced.  This could be because requests for injunctive relief are typically sought in conjunction with a motion to compel arbitration.  Because

---

[1] The agreement in *RGI* did not contain any language regarding injunctive relief but instead stated only that:

In the event that a dispute is submitted for arbitration pursuant to this paragraph, this Subcontract *shall continue in full force and effect* until such decision is rendered . . . If the Contractor has capability to honor such invoices it shall make such payments as required and the Subcontractor services shall continue until such time as a decision is rendered under this article.

*RGI, Inc.*, 858 F.2d at 230 (emphasis added).

**Memorandum Opinion and Order - Page 13**

DG sought injunctive relief immediately upon filing the arbitration to maintain the status quo pending arbitration, the court will consider its current motion.  Absent additional legal authority, though, the court would be reluctant to intervene and entertain any further requests for injunctive relief once arbitration on the merits is well underway since doing so would run afoul of the FAA's purpose of moving arbitrable disputes as quickly as possible to arbitration.

### 2.     DG's Request for a Preliminary Injunction

For the reasons explained below, the court determines that DG has not met its burden of establishing that it is entitled to a preliminary injunction based on the record before the court.

### a.     Alleged Solicitation of DG's Customers

DG contends that Boring breached his employment agreement by soliciting DG customers in violation of paragraph 4 of the agreement.  Paragraph 4 states:

> Agreement Not to Solicit the Corporation's Customers.  In order to protect the trade secrets of the Corporation, the Corporation's Confidential Information, and the Corporation's business goodwill and competitive position, and in exchange for the Corporation providing Employee the consideration set forth herein, Employee agrees that, for a period of twelve (12) months following the termination of his/her relationship with the Corporation for any reason, he/she shall not, either directly or indirectly, call on, service, solicit, or accept competing business from the Corporation's customers or prospective customers who or which Employee, within the previous two (2) years, had or made contact with, in any form whatsoever, regarding the Corporation's business.  Employee further agrees that he/she shall not assist any other person or entity in such a solicitation.

Def.'s App. 6, ¶ 4. DG contends that this provision is enforceable, and Boring violated the provision by contacting the following advertising agencies that it "considers" to be customers or clients: Goodby Silverstein & Partners ("Goodby"), Universal McCann, Agency 720, Campbell Ewald, and Doner.  *See* DG's Reply App. 2, ¶4.  Before addressing the parties' arguments regarding DG's

entitlement to injunctive relief, the court addresses whether the nonsolicitation agreement is enforceable.

### i.     Enforceability of Nonsolicitation Agreement

The nonsolicitation provision at issue is in essence a covenant not to compete. In Texas,[2] a covenant not to compete is enforceable if (1) it is ancillary to or part of an otherwise enforceable agreement at the time the agreement is made; and (2) the limitations of time, geographical area, and scope of activity are reasonable and do not impose a greater restraint than is necessary to protect the goodwill or other business interest of the promisee. Tex. Bus. & Com. Code Ann. § 15.50. The burden of proof lies with the employer as the promisee to demonstrate that the covenant meets the statutory criteria. Tex. Bus. & Com. Code Ann. § 15.51(b).

Boring does not respond to DG's enforceability argument other than to state that he was required to execute the employment agreement containing this provision on March 7, 2011, several years after his employment with DG and DG's predecessor began, and prior to this date, he had no restrictive covenant agreement with DG or its predecessor. In the Introduction to its reply brief, DG contends that "Boring . . . acknowledged the validity of his Employment Agreement and the enforceability of the restrictive covenants." DG Reply 1. DG does not set forth the basis for this contention, and the court notes Boring's decision to not address in detail DG's arguments regarding the enforceability of the covenant not to compete does relieve DG of burden of demonstrating that

---

[2] A federal court sitting in diversity applies the federal standard for determining whether a preliminary injunction should be granted. *Travelhost, Inc. v. Figg*, No. 3:11–CV–455, 2011 WL 6009096, at *2 (N.D. Tex. Nov. 22, 2011). Pursuant to the choice-of-law provision in the employment agreement, however, the court will apply Texas law, including the Covenants Not to Compete Act, Tex. Bus. & Com. Code Ann. § 15.50 *et seq.*, in deciding the substantive issue of whether the covenant at issue is enforceable. *See, e.g., Valley v. Rapides Parish Sch. Bd.*, 118 F.3d 1047, 1051 (5th Cir. 1997).

the covenant meets the statutory requirements.  The court addresses first whether an "otherwise enforceable agreement" exists since the court determines that it is dispositive of the issue of whether the covenant not to compete at issue is enforceable against Boring.  Tex. Bus. & Com. Code Ann. § 15.50.

As DG recognizes, an agreement is enforceable and not illusory when an employer promises to provide the employee with confidential information or other consideration, and then provides such information in return for the employee's promise to preserve the confidences of his employer.  *Alex Sheshunoff Mgt. Servs., L.P. v. Johnson*, 209 S.W.3d 644, 655 (Tex. 2006).  As explained by the court in *Alex Sheshunoff Management Services, L.P.,* an employer cannot "spring a non-compete covenant on an existing employee and enforce such a covenant absent new consideration from the employer."  *Id.* at 651.  In the typical arrangement, when an employee has an at-will arrangement, and he subsequently signs a covenant not to compete, "the employer's promise is prospective and becomes enforceable *only after the employer provides such confidential information or training*."  *Id.* at 655.

Here, Boring was not requested to sign a covenant not to compete until after working for DG and its predecessor for seven years, and he left the company nine months after the agreement was executed.  Thus, to be enforceable against him, DG must demonstrate that it promised to provide Boring with new consideration and actually provided him with the new consideration after the agreement was executed on March 7, 2011, but before he left the company on December 19, 2011.

The employment agreement at issue states:

> To assist Employee in the performance of his/her duties, the Corporation agrees to provide and shall provide Employee Confidential information and materials to him/her as a result of his/her signing this Agreement, with such Confidential

> Information being in addition to any such information Employee received from the Corporation prior to signing this Agreement. Employee acknowledges that he/she is receiving other good and valuable consideration, the adequacy of which Employee expressly acknowledges.

Def.'s App. 5, ¶ 2. Because DG agreed to provide Boring with new consideration in the form of additional confidential information and materials not previously provided, the covenant not to compete is enforceable if DG actually provided the additional confidential information and materials as promised.

DG contends that after the employment agreement was executed, it "exposed and entrusted Mr. Boring with additional Confidential Information, including but not limited to, competitive counter-selling strategies, and competitive analysis for Detroit-area agencies." DG's Mot. 11. For support that such information was provided after the agreement was executed, DG relies on the allegations in paragraph 12 of its verified Complaint. While DG alleges in its Complaint that Boring, by virtue of his position, had access to DG's confidential information, competitive counter-selling strategies, and competitive analysis for Detroit-area agencies, it does not state that this information was provided to Boring after the agreement was executed on March 7, 2011; nor does it state that this information was different from information he previously had access to before signing the agreement.

The court therefore concludes that DG has failed to meet its burden of demonstrating that the covenant not to compete or nonsolicitation agreement was ancillary to or part of an otherwise enforceable agreement at the time the agreement was made. As a result, the nonsolicitation agreement is not enforceable against Boring.

**Memorandum Opinion and Order - Page 17**

### ii.      Entitlement to a Preliminary Injunction

Even assuming that the covenant not to compete or nonsolicitation agreement is enforceable and the court considered DG's new evidence and arguments, DG would not be entitled to a preliminary injunction to enforce the nonsolicitation agreement.  In response to DG's motion, Boring contends that DG has presented insufficient evidence that he has or will violate the nonsolicitation provision and has not met its burden with regard to a preliminary injunction.  According to Boring, even assuming that he visited the Goodby and McCann advertising agencies since joining Extreme Reach, this does not establish that he did so to solicit the business of DG customers GM and Chrysler in violation of the employment.  Boring contends that such meetings, if any, could have been with regard to services offered by Extreme Reach that are not offered by DG.  DG counters that Boring has failed to specify what services Extreme Reach offers that DG does not and has never offered a valid explanation for his visits with Goodby and Universal McCann.  DG contends that Boring's silence in this regard speaks volumes.

DG's argument misconstrues the parties' respective burdens.  As the movant, DG has the burden of proof, not Boring.  Even if the court were to consider DG's new arguments and evidence, the court determines that DG has not met its burden of establishing a substantial likelihood of succeeding on the merits and irreparable harm necessary for a preliminary injunction.

### (1) Substantial Likelihood of Success

DG presented declaration testimony of  DG sales director Matthew L. Ruffi ("Ruffi") and DG senior vice president of sales Michael Caprio ("Caprio")  to establish that Boring contacted, met with, or solicited the following DG customers in violation of the employment agreement: Goodby, Universal McCann, Agency 720, Campbell Ewald, and Doner.  Even assuming that these entities

qualify as customers or prospective customers of DG[3] and that Boring contacted them to solicit business, the record is devoid of any evidence to show that these entities are customers or prospective customers of DG "who or which [Boring], *within the previous two (2) years, had or made contact with, in any form whatsoever, regarding the Corporation's business*" before leaving DG. Def.'s App. 6, ¶ 4.

Ruffi states that "Boring had client responsibility for Agency 720, Campbell Ewald, and Doner but says nothing about Goodby or Universal McCann. More importantly, neither Ruffi nor Caprio state that Boring had contact with these or the other entities regarding DG's business in the two years before he left DG to join Extreme Reach. Presumably Boring would have had contact during this time with customers he was responsible for; however, the court is limited to the record before it and cannot grant a preliminary injunction based on assumptions not supported by the evidence. The court therefore concludes, based on the evidence before it, that DG has not met its burden of demonstrating there is a substantial likelihood that it will prevail on the merits of its claim that Boring solicited DG's customers in violation of the nonsolicitation provision of the employment agreement.

The court further notes that Ruffi's and Caprio's testimony is based almost entirely on hearsay-within-hearsay and Caprio's understanding of what was communicated to others.

---

[3] The court notes that the parties appear to dispute whether the advertising agencies that act on behalf of DG's advertiser customers qualify as DG's customers for purposes of the parties' agreement and the nonsolicitation provision. DG uses the terms "customer" and "client" interchangeably, although the nonsolicitation provision refers to DG's "customers or prospective customers" without defining the term. It appears from Ruffi's declaration that the "advertisers themselves" are DG's actual customers. It is perhaps for this reason that Ruffi explains that DG "considers" "advertising agencies" that act on behalf of advertisers as customers as well. Since this issue was raised by DG for the first time in conjunction with its reply brief, Boring did not have the opportunity to address it. His statement, though, that his visiting Goodby or McCann is not evidence that he did so to solicit GM's or Chrysler's business in violation of the employment agreement indicates that he believes there is a distinction between the two.

Additionally, Caprio's testimony that "I am *not aware* that Extreme Reach offers any services that are not also offered by DG"[4] is not based on personal knowledge and is evidence only of his lack of knowledge as to the services offered by Extreme Reach.  DG's App. 15, ¶ 9.  While evidentiary standards at the preliminary injunction stage are less formal, and the court may rely on otherwise inadmissible evidence at the preliminary injunction stage and may issue a preliminary injunction without the presentation of evidence, it can do so only when the facts are not disputed.  *Sierra Club, Lone Star Chapter v. FDIC*, 992 F.2d 545, 551 (5th Cir. 1993).  Deciding controverted issues of fact based on affidavit testimony, however, especially affidavits containing hearsay-within-hearsay, is discouraged.  *Investcom Consortium Holding SA v. Wilmot*, Civ. A. H-08-2786, 2009 WL 958725 (S.D. Tex., Apr. 03, 2009) (citing 13 Moore's Federal Practice ¶ 65.23).

DG also presented an affidavit by its counsel, who states that during a conference with Boring's counsel, counsel for DG agreed to provide written confirmation of Boring's agreement not to solicit Goodby or Universal McCann pending settlement discussions.  DG's counsel further states in his affidavit that he sent Boring's counsel an e-mail regarding Boring's agreement not to solicit Goodby or Universal McCann while settlement discussions are taking place.  The e-mail referred to contains a proposal by DG's attorney, not Boring, that does not appear to have been responded to by Boring's counsel.  Moreover, DG does not explain, and it is unclear to the court why it believes that such a proposal by its own attorney supports its request for injunctive relief.  The court further notes that any agreement by  Boring or between the parties in this regard is not evidence that he has

---

[4]This statement by Caprio responds to Boring's contention that the meetings DG complains about could have been with regard to services offered by Extreme Reach that are not offered by DG.

or will breach the nonsolicitation provision of his employment agreement.  Accordingly, for this reason and the others explained, the court determines that DG has not demonstrated a substantial likelihood of prevailing on the merits of its claim that Boring violated the nonsolicitation agreement.

### (2) Irreparable Harm

DG has also failed to adduce any evidence, in the form of affidavits or otherwise, demonstrating why the loss of its customers and goodwill would result in irreparable harm.  While courts are willing to entertain a loss of customers or goodwill as a harm, the movant must come forward with evidence that such an injury is irreparable by showing that the loss cannot be measured in money damages.  *See Millennium Restaurants Group, Inc. v. City of Dallas*, 181 F. Supp. 2d 659, 666 (N.D. Tex. 2001).  Here, DG has not shown that it would suffer irreparable economic injury. Instead, it merely argues that: given Boring's conduct, it "faces a significant risk of suffering irreparable injury pending arbitration," DG Reply 10; that Boring "presents an enormous threat to DG's revenues and customer base. In addition to the *potential* for direct diversion of actual and potential customers, Mr. Boring *has the ability to inflict* incalculable long-term competitive harm on DG, because *he will exploit* (or at least draw upon) his near-daily exposure to DG's most competitive-valuable information for Extreme Reach's benefit," *Id*. 14; and that if Boring convinced "one significant customer to follow him to Extreme Reach, DG *potentially will be facing* the loss of significant future revenue, damages that would be exceedingly difficult if not impossible to calculate, and *perhaps* not recoverable at all from an individual employee." DG's Mot. 13 (emphasis added).  DG has presented no evidence, however, to support its argument that damages will be difficult to calculate or that monetary damages would be inadequate.  Because it cannot establish all

of the elements necessary for a preliminary injunction, DG would not be entitled to an preliminary injunction on this ground even if the court had determined that the covenant not to compete or nonsolicitation provision was otherwise enforceable.

### b.   Alleged Disclosure of DG's Confidential Information

As a general rule, in the absence of an enforceable agreement not to compete, an employer is not entitled to an injunction preventing a former employee from soliciting the employer's clients. *Rugen v. Interactive Bus. Sys., Inc.*, 864 S.W.2d 548, 551 (Tex. App.   Dallas 1993, writ denied). It is well established, however, "that even without an enforceable contractual restriction a former employee is precluded from using for his own advantage, and to the detriment of his former employer, confidential information or trade secrets acquired by or imparted to him in the course of his employment." *Id.* (internal citation and quotation omitted). Thus, the court's prior determination that the nonsolicitation agreement is unenforceable does not preclude it from granting injunctive relief to prevent any continuation of any alleged violation with regard to the disclosure of DG's confidential information. The court therefore considers whether DG has made the required showing for a preliminary injunction.

### i.   Substantial Likelihood of Success

In its original motion, DG argued it was at risk of having Boring disclose to his new employer Extreme Reach confidential information that he was privy to while employed by DG, including business and pricing plans and strategies, senior personnel contacts at advertisers, competitive information regarding DG's clients, and strategic plans for developing advantages over its competitors. DG expressed particular concern about Boring accessing certain materials before

leaving DG that were alleged to be confidential.  In response to Boring's argument that it had failed to come forward with any evidence in support of its assertion in this regard, DG contends for the first time in its reply brief that Boring "discussed confidential information regarding DG's internal systems and also made negative comments regarding DG having lost 'key' personnel" during a February 9, 2012 meeting with Goodby.  Information regarding DG's internal systems was not included in the list of materials Boring allegedly accessed before leaving DG.

To support its assertion that Boring disclosed confidential information regarding DG's internal systems, DG relies on the declaration of Ruffi, who states that Goodby is an advertising agency that exclusively serves DG's advertiser client GM and that DG considers Goodby to be a "customer" because advertising agencies typically act as key decision makers for advertisers.  DG's Reply App. 2, ¶ 4-5.  Ruffi further states that "[o]n or about February 9, 2012, I learned from one of my contacts within Goodby that Mr. Boring had again visiting [sic] Goodby's Detroit-area office. According to my contact, during that meeting, Mr. Boring discussed confidential information regarding DG's internal systems, and also made negative comments regarding DG having 'lost' key personnel." *Id*. ¶ 10.  Ruffi states that subsequently in February 2012, "[d]uring a . . . conversation with one of my Universal McCann contacts, a question was raised regarding DG's internal operating systems. As with the question asked by Goodby . . . the nature of the question asked by my Universal McCann contact indicated that confidential information regarding DG's internal operating systems had been disclosed." *Id.* ¶ 15.

DG also relies on the declaration of Caprio, who states that Goodby and Universal McCann are "customers," and Extreme Reach is one of DG's "arch competitors" and "[i]nformation regarding

perceived weaknesses in DG's internal operating systems would constitute confidential information for purposes of the non-disclosure provision." DG's Reply App. 15-16, ¶¶ 7, 10 and 13. Caprio's declaration also includes his understanding of the "intent" behind the nondisclosure provision contained in the employment agreement and his opinion that sales personnel, who agreed to the nondisclosure provision, "would recognize that such information was subject to the non-disclosure provision and was not to be disclosed." *Id.* ¶¶ 12-13. Caprio further states: "I understand that, following Mr. Boring's departure, DG's contacts within Goodby and Universal McCann have raised questions with DG regarding certain internal DG operating systems. The disclosure of this information by a former DG employee would constitute a violation of the non-disclosure provision." *Id.* ¶ 14.

DG's motion for preliminary injunction as to confidential information allegedly disclosed by Boring is based almost entirely on its new evidence and arguments. The court further notes that although DG contends that Boring disclosed information regarding DG's internal operating systems in early February 2012, it waited almost two months until March 23, 2012, after Boring had filed his response to DG's motion for preliminary injunction on March 9, 2012, before submitting the affidavits of Caprio and Ruffia in support of its motion. As a result, Boring did not have an opportunity to respond to DG's new evidence and argument concerning its internal operating systems. Even if the court were to consider this new argument and evidence by DG, it determines for the reasons explained herein that DG has not met its burden of establishing a substantial likelihood of success and irreparable injury.

**Memorandum Opinion and Order - Page 24**

The Fifth Circuit has held that "[w]hen a confidential employment relationship is established, the employer has a qualified right to secrecy that arises from the relationship and is required by principles of good faith. *Zoecon Indus., a Div. of Zoecon Corp. v. American Stockman Tag Co.*, 713 F.2d 1174, 1178 (5th Cir. 1983). In addition, "[t]he employee has a concomitant duty not to use or disclose the employer's trade secrets, if he knows or should have known that the employer desired secrecy." *Id.* Additionally, Texas law implies "as part of the employment contract an agreement not to disclose information which the employee receives as an incident of his employment 'if the employee knows that his employer desires such information be kept secret, or if, under the circumstances, he should have realized that secrecy was desired.'" *Mercer v. C. A. Roberts Co.*, 570 F.2d 1232, 1238 (5th Cir. 1978) (quoting *Lamons Metal Gasket Co. v. Traylor*, 361 S.W.2d 211, 213 (Tex. Civ. App.    Houston 1961, writ ref'd n.r.e.). A confidential employment relationship can be established by contract or implied from the nature of the parties' relationship. *See Zoecon Indus., a Div. of Zoecon Corp.*, 713 F.2d at 1178.

DG does not contend or offer evidence to establish that "perceived weaknesses in DG's internal operating systems" qualifies as a trade secret. *See Zoecon Indus., a Div. of Zoecon Corp.*, 713 F.2d at 1178; *In re Bass*, 113 S.W.3d 735, 739 (Tex. 2003) (applying six-factor test to determines existence of trade secret). The court therefore considers whether such perceived weaknesses in its internal operating systems qualify for protection as confidential or proprietary information and whether DG is entitled to injunctive relief on this ground.

Boring's employment agreement with DG includes a nondisclosure provision that states in pertinent part:

> Non-Disclosure of Confidential Information.  For purposes of this Agreement, "Confidential Information" shall mean any trade secret, confidential, proprietary, or non-public information and materials concerning the Corporation and/or its clients, whether such information or materials are memorized, memorialized in any manner, in hard copy, electronic, or other form, or that qualifies as confidential, restricted, or for internal use only pursuant to Corporation guidelines or the Handbook; the Corporation's products, business strategies, know-how designs, formulas, processes, and methods; research; marketing; pricing; business relationships; software, software code and other technologies; forecasts; margins; confidential information of other employees; plans and proposals; client information (including but not limited to lists of clients, client names, contact information, personal data or identifying compilation of same); and any other non-public, technical, non-technical, or business information, whether written or oral.  Employee acknowledges that the Corporation maintains much of its Confidential Information on its secure network and that the Confidential Information provides a competitive advantage to the Corporation. The term "Confidential Information does not include information that (1) has become known to the public generally through no fault of Employee, or (2) the Corporation regularly provides to third parties without restriction on use or disclosure.

Def.'s App. 4, ¶ 2.  Thus, a confidential relationship existed between Boring and DG; however, the provision at issue does not specifically refer to DG's "internal operating systems" and it is unclear from Caprio's and Ruffi's conclusory statements regarding DG's "internal operating systems" what is meant by this term.  Moreover, in interpreting the provision at issue, the court is not constrained to accept DG's construction and conclusory testimony that its internal operating systems or perceived weaknesses in such systems is confidential.  *Geske v. Wells Fargo Bank, Nat'l Ass'n*, No. 3:11-CV-3337-L, 2012 WL 1231835, at *3 (N.D. Tex. 2012).   Additionally, Caprio provides no basis or explanation for his conclusory assertion that Boring or any other employee who agreed to this nondisclosure provision would understand that it encompassed such information.  Without a

proper foundation to establish Caprio's personal knowledge for this statement, it is not evidence that

Boring knew or should have known that such information was to be treated as confidential.

Likewise, Caprio's testimony regarding Boring's alleged disclosure of information is predicated on his understanding, not personal knowledge.  *See Marshall Durbin Farms, Inc. v. National Farmers Org. Inc.*, 446 F.2d 353, 357 (5th Cir. 1971) (noting that courts are reluctant to issue an injunction where the moving party substantiates allegations on information and belief). Caprio's and Ruffi's testimony is also based on hearsay-within-hearsay.   Ruffi had alleged communications with undisclosed contacts at Goodby and Universal McCann, who according Ruffi, conveyed the substance of statements made by Boring.  Caprio's testimony is furthered removed in that it appears to be based on his understanding of what someone at DG told him about their conversations with Goodby and Universal McCann, who in turn conveyed what Boring said.  *See* DG's App. 16, ¶ 14.  Furthermore, while Caprio asserts that "perceived weaknesses" in DG's internal systems are confidential, neither he nor Ruffi goes as far as to state that Boring disclosed "perceived weaknesses" in DG's internal systems.   Thus, based on the record before it and the disputed nature of the proceedings, the court cannot conclude that there is a substantial likelihood that DG will prevail on the merits of its claim that Boring breached the nondisclosure provision of his employment agreement by allegedly disclosing information related to perceived weaknesses in DG's internal operating systems.

### ii.     Irreparable Harm

Even assuming that DG could satisfy the first prong, the court determines that it has not met its burden of establishing that there is a substantial threat that irreparable harm will result if the

injunction is not granted.  Loss of income, compensable after trial on the merits, or financial distress, does not constitute irreparable injury.  *Sampson v. Murray*, 415 U.S. 61, 90 (1974).  There is an exception to the general rule that damages cannot be compensable in monetary relief, but it applies only in cases "where the potential economic loss is so great as to threaten the existence of the movant's business" or where a business "would suffer a substantial loss of business and perhaps even bankruptcy" absent injunctive relief.  *Doran v. Salem Inn, Inc.*, 422 U.S. 922, 932 (1975); *see also Florida Businessmen v. City of Hollywood*, 648 F.2d 956, 958 n.2 (5th Cir. 1981) ("A substantial loss of business may amount to irreparable injury if the amount of lost profits is difficult or impossible to calculate, especially where . . . the loss of business may result in bankruptcy.").

DG argues but presents no evidence that it will likely suffer potential losses in revenue; no evidence regarding the impact of revenue on its business; and no evidence that any such loss in revenue would be difficult or impossible to calculate.  Moreover, while DG cites two cases in its reply brief for the proposition that the burden of proving irreparable injury is met where there is a "risk" that an employer's trade secrets or confidential information would be disclosed, the parties' arbitration agreement only permits the court to grant injunctive relief "to prevent any continuation of any violation" of the agreement.  Def.'s App. 8, ¶ 14.  It does not permit the court to grant injunctive relief to prevent a *risk* that DG may suffer monetary harm or a *risk* that its trade secrets or confidential information will be disclosed, especially where as here the court has concluded that DG has not met its burden regarding the substantial likelihood of success on the merits.

The cases cited by DG are also distinguishable because, unlike this case, the courts determined that the movants were likely to succeed on the merits of their claims.  The court therefore

concludes that DG has not demonstrated its entitlement to a preliminary injunction at this time with regard to Boring's alleged disclosure of confidential information.  Because the court has determined that DG cannot meet the first two requirements for a preliminary injunction, it does not address whether DG can meet the remaining requirements.

### c.      Alleged Recruitment of DG's Employees

Paragraph 5 of the employment agreement states:

> Agreement Not to Recruit Other Employees.  In order to protect the trade secrets of the Corporation, the Corporation's Confidential Information, and the Corporation's business goodwill and competitive position, and in exchange for the Corporation providing Employee the consideration set forth herein, Employee agrees that during his/her work with the Corporation and for a period of twelve (12) months following the end of Employee's work with the Corporation for any reason, he/she shall not, either directly or indirectly, call on, recruit, solicit, or induce any employee, contractor or officer of the Corporation whom Employee had contact with in the course of his/her or [sic]  work with the Corporation to terminate his/her relationship with the Corporation, and will not assist any other person or entity in such a solicitation.  Employee further agrees that he/she will not discuss, by any means whatsoever, with any such employee, contractor or officer of the Corporation the termination of such individual's relations with the corporation, during the time period set forth above.

Def.'s App. 6, ¶ 5.  In its February 2, 2012 memorandum opinion and order, the court noted that DG had not made any allegations or put forth any evidence that Boring had recruited or planned to recruit DG's employees in violation of paragraph 5 of his employment agreement.  In his response to DG's motion for preliminary injunction, Boring similarly contends that DG has offered nothing more than speculation to support its argument that he has or will violate the employment agreement.  In its March 23, 2012 reply brief, DG again presented no argument or evidence to show Boring had or intended to violate the nonrecruitment provision.

Eleven days after filing its reply brief and the deadline for filing a reply, DG filed a Notice

of Filing of Additional Declarations in Support of Motion for Preliminary Injunction.   The

submission was filed without leave of court and contains no certificate of conference, which is in

violation of Local Rule 7.1.   DG contends in the supplemental submission that text messages and

voice mails retrieved from Boring's company cellular phone reveal that he recruited DG employee

Peggy Griffith in violation of paragraph 5 of his employment agreement.

Attached to DG's April 3, 2012 submission is a supplemental declaration by Ruffi and a copy

of the text messages and voice mails that were transcribed at Ruffi's direction.  According to Ruffi's

declaration, DG took possession of Boring's company-issued telephone immediately upon his

departure on December 19, 2011, and sent it to DG's Irving, Texas headquarters.  He states that on

March 30, 2012, he reviewed the transcript of the text messages and voice mails retrieved from

Boring's telephone.  He does not explain why DG waited almost three months to retrieve and review

this information after Boring left the company.[5]

Ruffi further states that several of the text messages and voice mails retrieved identify the

"owner" as "Patrick."  DG's Supp. App. 3, ¶ 8.  Ruffi asserts that "*I am aware that* (413) 822-1839

is the cellular phone number of Patrick Hanavan, the Senior Vice President of Sales for Extreme

Reach (Mr. Boring's current employer)," but it is unclear from his declaration where he obtained this

information or why he would have personal knowledge of what appears to be Hanavan's personal

---

[5] DG also submitted the declaration of Brendan Sullivan ("Sullivan"), who is the senior vice president of engineering and information technology for DG.  Sullivan describes the chain of custody for Boring's telephone and states that he provided it to DG's counsel on March 29, 2012.  Like Ruffi, Sullivan does not explain why DG delayed in coming forward with this information in support of its request for injunctive relief.

cellular telephone number.  Ruffi goes on to assert that "[t]he content of the messages confirms that the 'Patrick' referenced in the messages is Mr. Hanavan."  *Id.*

Based on his review of the messages, Ruffi contends that from November 7, 2011, until Boring's last day at DG on December 19, 2011, Boring exchanged at least 44 text messages with the caller from (413) 822-1839.  In addition, there were two voice mails left from the same caller on Boring's telephone on December 30, 2011, after Boring left DG.  Based on a November 28, 2011 text message, Ruffi contends that Boring encouraged Hanavan to hire DG employee Peggy Griffith. The transcription of the November 28, 2011 text message states: "Me: Is peggy on your radar? Gateway: Anyone that is a good fit is an option. I have heard good things about her."  DG's Supp. App. 7, ¶¶ 1-4.  According to the transcription, "Gateway" refers to the "(413-822-1839)" telephone number.  DG's Supp. App. 5.

Because DG provides no explanation for the delay or its failure to confer with Boring, the court declines to consider this new evidence.  Even if the court were to consider the new evidence and determine that the November 29, 2011 test message and Ruffi's inadmissible "I am aware" testimony regarding Hanavan's personal telephone number is sufficient to establish that DG is substantially likely to prevail on the merits of its claim that Boring violated paragraph 5 of the

employment agreement.[6] the court concludes that there is no evidence to establish the requisite irreparable harm required for injunctive relief.

DG has presented no evidence to support its conclusory assertion and generalized fear that "[i]f Mr. Boring is permitted to recruit personnel from DG to Extreme Reach, DG's Detroit office will wither, the relationships it has developed with advertisers will diminish, if not terminate altogether, and DG will be irreparably harmed." Pl.'s Compl. 12, ¶ 40. Speculative injury does not constitute the irreparable harm that would justify injunctive relief. *Holland America Ins. Co.*, 777 F.2d at 997 ("Speculative injury is not sufficient; there must be more than an unfounded fear on the part of the applicant."). Further, DG has not established by evidence or attempted to establish (1) the difficulty of recruiting employees like Griffith or Palmer, (2) the amount of money and time spent training such employees, or (3) any specialized knowledge that Griffith or Palmer have that would make the loss irreparable and a remedy at law inadequate. Thus, DG's request for a preliminary injunction on this ground must be denied.

## V.     Boring's Request to Stay the Case Pending Arbitration

As the parties are in arbitration or "within the arbitration forum" as required by their agreement, there is no need for the court to compel arbitration or refer the matter to arbitration. Further, under these circumstances, a stay of this action is not warranted. Based on the terms of the

---

[6] DG presented no evidence to support its prior assertion that Boring recruited Palmer. Assuming that the text messages and voicemails attached to Ruffi's declaration were between Boring and Hanavan, the court finds, after reviewing all of messages, that only the November 28, 2011 text message comes remotely close to indicating that Boring *may have* violated the nonrecruitment provision. Without more information to put it in context, however, the court cannot say that this short, cryptic exchange that occurred on November 28, 2011, is evidence that he violated or intended to violate the nonrecruitment provision. The remaining messages attached to Ruffi's declaration deal with personal information like putting the kids to bed, playing basketball, and other mundane information that is entirely irrelevant to this proceeding.

agreement between DG and Boring, all claims between them are arbitrable and therefore subject to arbitration. Having determined that all of the issues raised by the parties must be submitted to arbitration, and finding no reason to maintain jurisdiction over this action, the court **dismisses** the action **with prejudice** rather than stay it.  *See Alford v. Dean Witter Reynolds, Inc*., 975 F.2d 1161, 1164 (5th Cir. 1992) (citation omitted).

## VI.    Conclusion

For the reasons herein explained, the court **concludes** that it has personal jurisdiction and that DG it is not entitled to a preliminary injunction based on the record before the court.  Accordingly, the court **denies** Defendant's Motion to Dismiss Plaintiff's Verified Complaint and **denies as moot** its Alternative [Request] to Stay the Proceedings (Doc. 13); **denies** Plaintiff's Motion for Preliminary Injunction in Aid of Arbitration (Doc. 5); **grants** Plaintiff's Motion for Leave to file Recast Reply Brief (Doc. 28); and **denies as moot** Defendant's Motion to Strike Plaintiff's Reply Brief in Support of Motion for Preliminary Injunction (Doc. 25).  The United States District Clerk is **directed** to file Plaintiff's Recast Reply Brief in Support of Motion for Preliminary Injunction (Doc. 28-1).  For the reasons herein stated, the court exercises its discretion and **dismisses with prejudice** this action so that the parties may arbitrate in accordance with the terms of their agreement.

**It is so ordered** this 24th day of April, 2012.

*Sam A. Lindsay*

Sam A. Lindsay
United States District Judge